WILL E. WOODALL, ADMINISTRATOR OF THE ESTATE OF DEAN B. STOVER, SR., DECEASED, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 26 November, 1952.)

**Railroads § 4—Evidence held to show contributory negligence as matter of law on part of motorist driving across tracks without looking.**

The evidence tended to show that on a day when a light rain was falling, a motorist, first in a line of traffic stopped at a crossing by a southbound train, started across the tracks immediately the crossing was cleared by the southbound train, and was struck by a northbound train on the far track notwithstanding that the tracks were straight and that his view was unobstructed when he reached a point within about twenty feet of the tracks. There was also evidence that the flagman attempted to attract the motorist's attention and keep him from continuing across the tracks. *Held:* The evidence discloses contributory negligence as a matter of law on the part of the motorist, barring recovery. Testimony of one of plaintiff's witnesses that the motorist could not have seen the flagman *held*, when considered in context, merely an argumentative deduction of the witness respecting the estimate of the motorist's vision.

PARKER, J., took no part in the consideration or decision of this case.

APPEAL by plaintiff from *Sharp, Special Judge,* August Special Term, 1952, of JOHNSTON.

Civil action by plaintiff to recover damages for the alleged wrongful death of his intestate, caused by an automobile-train collision at a grade crossing.

The collision occurred about 11:00 o'clock on the morning of 12 January, 1950, when the DeSoto automobile driven by the plaintiff's intestate, Dean B. Stover, Sr., was struck by one of defendant's freight trains at a grade crossing in the town of Benson, North Carolina, where Main Street crosses the north-south double line tracks of the defendant railroad. The tracks run through the town of Benson in a north-south direction; Main Street runs east and west and crosses the railroad at about right angles. The intestate was driving easterly, and was first in a line of cars stopped on the west side of the crossing while it was blocked by a southbound passenger train on the track next to him. As soon as the rear of the passenger train cleared the crossing, intestate drove his car across the southbound track next to him onto the easternmost track, on the far side, immediately in front of, and was hit by, the locomotive of an approaching northbound freight train. Intestate was fatally injured in the collision.

A watchman or flagman was regularly maintained by the defendant at the crossing. Intestate was employed as a traveling salesman. During the preceding 35 years he visited Benson three or four times a year.

The evidence respecting physical conditions around the crossing at the time of the collision may be summarized as follows: Main Street at the railroad crossing is about 66 feet wide. On the south side of the street, next to the west side of the railroad right of way, is a brick store building known as Hudson's place. Opposite this store and on the north side of the street, next to the railroad right of way, is the First Citizens Bank & Trust Company building. Both of these buildings are about 65 feet from the southbound or westernmost railroad track, and it is about 8 feet between the east rail of the southbound and the west rail of the northbound tracks. Located on the right of way between the Hudson Building and the railroad tracks was a watchman's shanty—a little house 8 or 10 feet square and about 12 feet high. This shanty was located about 20 feet from the west rail of the northbound track. Some cars were parked near the shanty on Railroad Street, but there was "no obstruction to a view of the track to the south at a point even with the watchman's shack. . . . After you pass the watchman's shack you can see an indefinite distance down the track. . . ."

The plaintiff's further evidence may be summarized as follows:

The witness Chester Tart testified: ". . . I was standing between Hudson's store and the railroad track, . . . in Railroad Street. I saw a maroon car (intestate's) sitting on Main Street, stopped, about 8 or 10 feet from the southbound line. . . ., and as quick as the train going south cleared the track, he started on across. The freight train was coming north and hit him right plumb in the side. . . . I saw the watchman at the crossing. When the car started to pulling off after the passenger train pulled on south, the flagman broke out from the house and started out there, he was about halfway from the little house to Main Street. The flagman made efforts to stop him. He held up the flag and hollered something . . ., the car was going across the southbound track. The watchman was on the right side of the car. . . ., not on the track; . . . As the watchman raised his stop sign and flag, the car was going down Main Street, . . . The car wasn't making over 10 miles an hour; it had just started in low gear. I did not hear any signal right at that time, but just about the time it hit, the best I recollect, the train blew. . . . I would say the train was making between 50 and 75 miles an hour." Cross-examination: ". . . It was raining hard enough some people had on rain-coats . . ., but at that time it was drizzling. . . . The watchman stand is on the west side of the railroad, and the way Mr. Stover was traveling it would have been on his right. The watchman was in the little house when he started to pull off. I would say Mr. Stover was not over 15 or 20 feet from the nearest rail of the southbound track, the first rail of the first track. . . . When the flagman was trying to stop him, he had done started across. Mack had a stop sign and hollered something when Mr.

Stover crossed the southbound track. If he touched the car, I did not see him, he was not close enough to touch it when he crossed the first track. . . . I didn't see Mr. Stover look to the right or left, it was so quick; . . . About the time he hit the first track, the watchman raised the flag and hollered something. . . . At the time he was talking to Mr. Stover and trying to get him to stop, I would say he was about 7 feet from him, about middleway of the car. . . . The Stover car was the only one that tried to pass."

The witness Mike Parnell testified in part: ". . . I was standing beside Hudson's store, . . . When the passenger train pulled up . . ., the fellow who got killed pulled up and stopped and waited until the train pulled off. As soon as this train pulled off, I looked around toward him, he throwed up his hand at me, and when he pulled across the track this other train hit him. . . . I did not observe the watchman. I looked at the center of the street. . . . I did not hear any warning sound such as a whistle or bell and didn't even know the train was around. In my opinion the train was running between 60 and 70 miles an hour when it hit the car."

Earl Stewart testified in part: ". . . I was standing on the street on the northwest side right in front of the Citizens Bank. The maroon DeSoto car came in about 7 or 7½ feet from me. The weather was bad, you couldn't see. It was cold and foggy and rainy; you couldn't see through the glass at all. . . . I didn't observe the watchman in the vicinity right at that time, but just about the time the train hit the car, I looked and saw the watchman. . . . When Mr. Stover started across the railroad track, the watchman was on the south side of Main Street, just the least bit; . . . he was over halfway on the south side. I didn't hear any warning signals such as whistle or bells. . . ." Cross-examination: ". . . The passenger train had moved off when I first saw the DeSoto car coming directly west. It was moving when I saw it first; . . . The flagman was across the street, a little below the middle of the street toward the south. . . . Mr. Stover was not crossing in the middle of the street, he made kind of a little curve on the left side of the street going east. Cars were parked, and he came in around the cars, . . . I say he could not have seen the flagman. He couldn't have or I couldn't have either. . . . There was no car in front of Mr. Stover when he whipped around to the left."

The witness Fulton Surles testified: ". . . I came out of the Clerk's office at the back of the bank and happened to be there at the time this happened. . . . I saw the crossing watchman. I couldn't say the position of the crossing watchman at the time the car started to move. I was about 115 or 120 feet away, standing in the door, and it looked like the watchman tried to stop the car. The watchman was kind of on the side

of the car, the south side of the street, the off-side from the driver.  I couldn't say I heard the whistle blow." Cross-examination: ". . . I saw one train pass going south towards Dunn.  The train that hit the car was going north towards Four Oaks and Smithfield. . . . After passing the Hudson corner and before he got to the watchman's tower, he could have seen an approaching train from the direction of Dunn a good ways, a block, I would say. . . . After the car passed Hudson's corner and before he got to the little house, he could have seen a pretty good ways, a mile if it was clear, right straight down the railroad. . . . As soon as he passed that (the watchman's shanty), he could see a mile down the railroad.  It is perfectly straight.  It is something like 20 feet from the eastern edge of the watchman's tower to the first rail of the northbound line, I don't know definitely, but there were six or seven steps within which a man could have seen one or two miles.  It had been raining that morning, and at the time the train hit the auto it was dropping a light rain, not hard enough to keep a man from seeing a train. . . ., it looked like the watchman tried to stop the man.  He had a red flag and a stop sign in his hand. I could see them both. . . . He was waving the flag as it started across, and I believe he touched the car.  I couldn't tell where he touched it from where I was, but it looked to me like he was kind of at the right-hand front of the car.  The driver was on the other side. . . . I could not tell whether the man in the car looked in either direction. . . . He was the first man to cross. . . ., and no one else attempted to cross at that time."

Plaintiff's witness C. N. Proctor testified on cross-examination that he was standing in the door of the baggage room on the west side of the station, adjacent to the northbound tracks, and had a clear and unobstructed view of the Main Street crossing, except as it was blocked by the southbound train before it pulled off: "I saw Hosea Mack, the crossing watchman, standing in the crossing in the middle of the east side, holding up the sign and flag in the middle of the street.  I saw a maroon-colored car approaching the watchman from the west.  As soon as the rear of No. 75 (the passenger train) cleared, this maroon car (intestate's) came up from the west going east rather fast.  It looked to me like he drove around something else and was driving around the rear of 75.  The crossing watchman was in the middle of the street trying to stop traffic. . . . The Stover car was the only one that moved onto the track. . . . At the time the car passed the crossing watchman, it was close enough for him to hit the side of the car with his flag and stop sign. . . . There was just a little drizzle, vision was good; . . . Where a vehicle passes the eastern edge of that (Hudson) building, there was nothing to obstruct the view to the south except the rear of the train that had just departed.  I heard the signals of the freight train going north call for signals.  He blowed the whistle four times, calling for instructions. . . ."

The defendant offered the testimony of several eyewitnesses who testified that timely signals were given by the approaching freight train and that the watchman, Hosea Mack, did not leave the street crossing or go back to the shanty prior to the arrival of the freight train that struck the intestate. In substance, these witnesses said that as soon as the rear of the southbound train cleared the crossing, the watchman from his position in the street on the east side of the tracks moved over to the west side facing intestate and the line of traffic behind him. As the witness Norman Duncan put it, the watchman "crossed from one side to the other near the center of the street. . . . I would say a little bit south of center. He had a red flag in his hand and an iron sign that says 'STOP' . . ." The witness Aaron Johnson said: "After the passenger train got by, I saw Hosea Mack somewhere near the middle of the street with a red flag in one hand and a stop sign in the other which was a round piece of metal about 18 inches. I think he was in such a position as to be seen by people crossing the street if they had looked. . . . He took the red flag and waved it right over near the windshield of the Stover car and said something to him. . . . I was about 8 feet from the Stover car at the time he started its movement across the intersection. . . . From the time the passenger train got there until the time Mr. Stover was killed I did not see Mack go to the watchman's shack, and I was 6 or 8 feet from the shack, right there at it."

The defendant's motion for judgment as of nonsuit, made at the close of the plaintiff's evidence and renewed at the conclusion of all the evidence, was allowed, and from judgment based on such ruling the plaintiff appealed, assigning the ruling and judgment of the court as error.

*E. A. Parker and Jane A. Parker for plaintiff, appellant.*
*Shepard & Wood for defendant, appellee.*

Johnson, J. This case involves no new question requiring extended discussion. Conceding, without deciding, that the evidence offered below made out a *prima facie* case of actionable negligence against the defendant, even so, it is manifest, as the only reasonable inference deducible from the plaintiff's evidence, that the intestate, in driving his car on the northbound track immediately behind a passing train, without in any way trying to ascertain whether another train was about to pass on this track, and in failing to pay attention to the warning given by the watchman in the street, failed to exercise due care for his own safety, and that such failure to exercise due care contributed to, and was a proximate cause of, his death. This defeats recovery. The case is controlled by the principles explained and applied in *Harrison v. R. R.,* 194 N.C. 656, 140 S.E. 598. See also: *Moore v. R. R.,* 203 N.C. 275, 165 S.E. 708; *Johnson v.*

*R. R.,* 214 N.C. 487, 199 S.E. 704; *Miller v. R. R.,* 220 N.C. 562, 18 S.E. 2d 232; *Godwin v. R. R.,* 220 N.C. 281, 17 S.E. 2d 137; *Carruthers v. R. R.,* 232 N.C. 183, 59 S.E. 2d 782; *Jones v. R. R.,* 235 N.C. 640, 70 S.E. 2d 669; 44 Am. Jur., Railroads, Sec. 556; Annotation: 56 A.L.R. 543.

We have not overlooked the statement of the plaintiff's witness Earl Stewart that "he (intestate) could not have seen the flagman." This statement was made on cross-examination. When considered in context it is nothing more than an argumentative deduction of the witness respecting his estimate of the range of intestate's vision while he was pulling to the left side of the street to go over the tracks. Previously, this witness had stated that the watchman was out in the street—"just the least bit . . . over halfway on the south side." See *Parker v. R. R.,* 232 N.C. 472, bot. p. 474; 61 S.E. 2d 370; *Tart v. R. R.,* 202 N.C. 52, 161 S.E. 720; *Harrison v. R. R., supra.*

The judgment below is
Affirmed.

PARKER, J., took no part in the consideration or decision of this case.